**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| AKEEM DANIELS, CAMERON STINGILY, and NICHOLAS STONER, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:16-cv-01230-TWP-DKL |
| FANDUEL, INC., and DRAFTKINGS, INC., | ) ) ) | |
| Defendants. | ) | |

## ENTRY ON DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT

This matter is before the Court on the Defendants' Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6). (Filing No. 26; Filing No. 28.) Also before the Court is Plaintiffs Motion for Leave to file a Surreply. (Filing No. 61.) The Plaintiffs, Akeem Daniels, Cameron Stingily, and Nicholas Stoner (collectively, "Plaintiffs") are individuals who played football at the collegiate level. They have filed suit against Defendants FanDuel, Inc. ("FanDuel") and DraftKings, Inc. ("DraftKings") (collectively, "Defendants"), companies that run fantasy sports websites and mobile apps. Plaintiffs allege that FanDuel and DraftKings used their names and likenesses in operating and promoting online fantasy sports contests without Plaintiffs' consent, and that doing so was a violation of their right of publicity under Indiana law. Defendants argue that Plaintiffs have not stated a claim upon which relief can be granted, because a series of statutory exceptions, the First Amendment to the United States Constitution, and federal copyright law all shield Defendants from liability under Indiana's right-of-publicity statute. For the reasons that follow, the Court **grants** the Defendants' Motions to Dismiss and **denies as moot**, the Plaintiffs Motion for Leave to file a Surreply.

## I.  BACKGROUND

The following facts are not necessarily objectively true.  But as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the Amended Complaint and draws all reasonable inferences in favor of Plaintiffs as the nonmoving party.  *See Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

Defendants run daily fantasy sports companies, operated via websites and mobile platforms.  (Filing No. 17 at 4.)  In these daily fantasy sports games, a customer pays Defendants an entry fee, and in exchange receives virtual currency.  (Filing No. 17 at 4.)  To create the fantasy competition, Defendants assemble a group of select collegiate players to appear on a list of available athletes, and they assign each player a fictitious "salary."  (Filing No. 17 at 7.)  Using his virtual currency, a customer can then purchase the services of individual athletes to complete his team roster for each fantasy contest, subject to a "salary cap" assigned to each customer.  (Filing No. 17 at 7.)  Defendants have developed systems by which certain numbers of points are awarded for selected statistically tracked athletic achievements.  (Filing No. 17 at 4.)  Based on the athletes' real-life performances in sporting events, each athlete on the fantasy team scores a certain number of points in each contest.  (Filing No. 17 at 4.)  For example, an athlete may receive points for scoring a touchdown in football or making a three-point shot in basketball.  (Filing No. 17 at 4.)  Those points are then aggregated, and a customer is eligible to win cash prizes if his fantasy team's performance exceeds the performance of other customers' teams.  (Filing No. 17 at 4.)

Plaintiffs are individuals who played football at the collegiate level for institutions governed by the constitution and bylaws of the National Collegiate Athletic Association ("NCAA").  (Filing No. 17 at 2-3; Filing No. 17 at 5-6.)  The three named Plaintiffs were featured on Defendants' sites.  (Filing No. 17 at 11-23.)  Their names appeared on the roster of available

players on at least one occasion.  (Filing No. 17 at 11-23.)  They were each assigned fictitious salaries during the weeks that they were featured as available athletes.  (Filing No. 17 at 11-23.) Commentary regarding Plaintiffs' likely performance, as compared to their assigned salaries (their "value"), also appeared on the sites.  (Filing No. 17 at 11-23.)

It is estimated that the daily fantasy sports industry generated roughly $3.0 billion in customer entry fees in 2015.  (Filing No. 17 at 1.)  Defendants use sophisticated marketing campaigns to attract users to their websites, and they use athletes' names and likenesses in that marketing.  (Filing No. 17 at 16; Filing No. 17 at 23.)  Numerous media outlets produce weekly fantasy sports-related broadcasts, offering strategy and advice for success in fantasy competition. (Filing No. 17 at 25.)

Plaintiffs have filed an Amended Complaint in this Court, alleging that Defendants violated Plaintiffs' rights of publicity under Indiana Code Section 32-36-1-1 *et seq.*  (Filing No. 17.) Defendants have each filed Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing that Plaintiffs have failed to state a claim upon which relief may be granted.  (Filing No. 26; Filing No. 28.)  The motions are ripe for the Courts consideration.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal if the complaint fails to set forth a claim upon which relief can be granted.  "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits."  *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990).  Accordingly, when analyzing a Rule 12(b)(6) motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff, accepts all factual allegations as true, and draws all reasonable inferences in favor of the plaintiff.  *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

At a minimum, the complaint must give the defendant fair notice of what the claim is and the grounds upon which it rests; and the factual allegations must raise a right to relief above the speculative level. *See Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602-03 (7th Cir. 2009); *Tamayo*, 526 F.3d at 1081, 1083. While a complaint need not include detailed factual allegations, a plaintiff has the obligation to provide the factual grounds supporting his entitlement to relief; and neither bare legal conclusions nor a formulaic recitation of the elements of a cause of action will suffice in meeting this obligation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("the pleading standard Rule 8 . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").

Although this does not require heightened fact-pleading, it does require the complaint to contain enough facts to state a claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 570; *Tamayo*, 526 F.3d at 1083 ("[a] plaintiff still must provide only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible rather than merely speculative, that he is entitled to relief").

## III.  DISCUSSION

Indiana Code Section 32-36-1-8(a) provides that a "person may not use an aspect of a personality's right of publicity for a commercial purpose during the personality's lifetime or for one hundred (100) years after the date of the personality's death without having obtained previous written consent from a person specified in section 17 of this chapter." Ind. Code § 32-36-1-8(a). The statute defines a person's right of publicity as "a personality's property interest in the personality's: (1) name; (2) voice; (3) signature; (4) photograph; (5) image; (6) likeness; (7) distinctive appearance; (8) gestures; or (9) mannerisms." Ind. Code § 32-36-1-7. Plaintiffs allege

4

that Defendants have violated Ind. Code § 32-36-1-8(a) by featuring Plaintiffs on their fantasy sports sites.

Defendants have moved for dismissal, raising three arguments as to why Plaintiffs' claims cannot succeed: (1) that four statutory exceptions remove the subject materials from the coverage of the right-of-publicity statute; (2) that Defendants' First Amendment rights trump any publicity rights that Plaintiffs may have; and (3) that Plaintiffs' claims are preempted by federal copyright law.

## A.     Statutory Exceptions

Indiana Code Section 32-36-1-1 designates the applicability of the chapter regarding the right of privacy under Indiana law.  Subsection (c) specifies that the chapter, and therefore Indiana Code Section 32-36-1-8(a), does not apply to, *inter alia*, the following:

1.  The use of a personality's name, voice, signature, photograph, image, likeness, distinctive appearance, gestures, or mannerisms in material that has **political or newsworthy value**.  Ind. Code § 32-36-1-1(c)(1)(B) (emphasis added).

2.  The use of a personality's name, voice, signature, photograph, image, likeness, distinctive appearance, gestures, or mannerisms in connection with the broadcast or reporting of an event or a **topic of general or public interest**.  Ind. Code § 32-36-1-1(c)(3) (emphasis added).

3.  The use of a personality's name, voice, signature, photograph, image, likeness, distinctive appearance, gestures, or mannerisms in **literary works**.  Ind. Code. § 32-36-1-1(c)(1)(A) (emphasis added).

4.  The use of a personality's name to truthfully identify the personality as the **performer of a recorded performance**.  Ind. Code § 32-36-1-1(c)(2)(B) (emphasis added).

Defendants argue that these enumerated statutory exceptions remove their conduct from the coverage of the right of publicity statute.  (Filing No. 29 at 21-22; Filing No. 27 at 5-6.) Defendants argue that if the Court concludes that even one of those exceptions applies, Plaintiffs' claims fail as a matter of law.  Plaintiffs respond that none of the statutory exceptions apply.  (Filing

No. 44 at 28-40.) Plaintiffs further argue that even if any of the exceptions would otherwise apply, they do not in this instance because Defendants were engaged in illegal gambling activities. (Filing No. 44 at 20-28.) Because this issue is dispositive, the Court begins its analysis by addressing the exceptions.

### 1.   **Newsworthiness Exception**

Indiana Code § 32-36-1-1(c)(1)(B) specifies that the right to publicity does not apply to "[t]he use of a personality's name, voice, signature, photograph, image, likeness, distinctive appearance, gestures, or mannerisms in material that has political or newsworthy value."

### a.   **Definition of "Newsworthy"**

Defendants contend that the statutory exception for "material that has political or newsworthy value" removes their conduct from the ambit of the right-of-publicity statute. (Filing No. 27 at 10; Filing No. 29 at 22.) They assert that under Indiana law, "newsworthiness" is broadly construed and includes the material that is disseminated via their websites. (Filing No. 27 at 10; Filing No. 29 at 23.) Defendants further argue that courts have concluded that entertainment falls within the newsworthiness exception, which includes the conduct at issue here. (Filing No. 27 at 10-12; Filing No. 29 at 23-24.)

Plaintiffs respond that the newsworthiness exception does not apply to shield Defendants' conduct, because that exception applies only to non-commercial speech. (Filing No. 44 at 29-44.) They also contend that case law supports applying the newsworthiness exception to news or media outlets, but not to entities such as Defendants, who are not "reporting" information. (Filing No. 44 at 30-31.) In addition, they argue that Defendants made representations that were distinct from the dissemination of news and statistics by assigning Plaintiffs fictitious salaries, and that those representations would not be encompassed by the exception. (Filing No. 44 at 32.)

On reply, Defendants argue that the exceptions enumerated in Indiana Code § 32-36-1-1 must apply to commercial speech, because the right-of-publicity statute explicitly applies only to commercial speech.  (Filing No. 51 at 8; Filing No. 52 at 12-13.)  In other words, non-commercial speech is already immune from treatment by the statute, so exceptions applying only to non-commercial speech would be superfluous and unnecessary.  (Filing No. 51 at 8; Filing No. 52 at 13.)

The Court begins by underscoring that, by its terms, Indiana Code § 32-36-1-8(a) provides that a person may not, without consent, "use an aspect of a personality's right of publicity *for a commercial purpose* during the personality's lifetime or for one hundred (100) years after the date of the personality's death…"  Ind. Code § 32-36-1-8(a) (emphasis added).  The Court agrees with Defendants that, by the statute's own plain and explicit language, § 32-36-1-8(a) applies to the use of a person's right of publicity when that use has a commercial purpose.  Therefore, the universe of prohibited conduct is, from the outset, limited to material that is used for a commercial purpose.  The enumerated exceptions then carve out certain categories of uses that will not trigger liability.  Because the statue only applies to uses with a commercial purpose, the exceptions must apply to uses that are commercial in nature.

The first key issue, then, is to determine the contours of the term "newsworthy" under Indiana law.  Notably, neither the parties nor the Court uncovered any cases addressing the newsworthiness exception under Indiana Code § 32-36-1-1(c)(1)(B).  Sitting in diversity, the court's role "is not to create state law, but rather to follow the principles enunciated by the state courts and to predict what the Indiana Supreme Court would hold in such a situation."  *Miller v. Pardner's, Inc.*, 893 F.2d 932, 934 (7th Cir. 1990).  This Court must predict how the Indiana Supreme Court "would decide the case, and decide it the same way."  *MindGames, Inc. v. W.*

7

*Publ'g Co.,* 218 F.3d 652, 655 (7th Cir. 2000) (citations omitted).  Because neither the Indiana

Supreme Court nor the Indiana Court of Appeals have weighed in on this issue, this Court must

base its decision on whatever authority is available.  A determination of what is newsworthy may

be made as a matter of law.  *See Dillinger, LLC v. Electronic Arts, Inc.,* 795 F. Supp. 2d 829, 835

(S.D. Ind. 2011) (determining whether "literary works" exception applied at the motion for

judgment on the pleadings stage).

Defendants argue that under Indiana law, the term "newsworthy" is "broadly construed."

(Filing No. 29 at 22.)  They contend that the definition articulated by this Court in *Time Inc. v.*

*Sand Creek Partners, L.P.,* 825 F.Supp. 210 (S.D. Ind. 1993) illustrates the breadth of the

newsworthiness exception.  In that case, the Court concluded that:

> [t]he scope of the subject matter which may be considered 'of public interest' or
> 'newsworthy' has been defined in most liberal and far reaching terms.  The
> privilege of enlightening the public is by no means limited to dissemination of news
> in the sense of current events but extends far beyond to include all types of factual,
> educational and historical data, or even entertainment and amusement, concerning
> interesting phases of human activity in general.

*Sand Creek,* 825 F. Supp. 210 at 211-12 (quoting *Rogers v. Grimaldi*, 695 F. Supp. 112, 117

(S.D.N.Y. 1988)).  Plaintiffs contend that *Sand Creek* does not apply here, because that case was

decided prior to the enactment of Indiana's right-of-publicity statute.  (Filing No. 44 at 30.)

Deciding whether to adopt the broad definition of "newsworthy" that Defendants propose

has significant constitutional implications.  A holding that the newsworthiness exception does not

apply in this context would set the right-of-publicity statute up for a constitutional challenge,

because it would constitute the enforcement of a limitation on a private party's freedom of

expression.  *See* Filing No. 29 at 28-41; *see also Dillinger,* 795 F. Supp. 2d at 835-36.  When faced

with ambiguous statutory language, the Indiana Supreme Court follows the "familiar canon of

statutory interpretation that statutes should be interpreted so as to avoid constitutional issues." *City of Vincennes v. Emmons,* 841 N.E.2d 155, 162 (Ind. 2006) (citations omitted).

Interpreting "newsworthiness" broadly would effectuate the General Assembly's obvious attempt to avoid potential constitutional infirmities with the statute.  As pointed out in *Dillinger*,

> the other exceptions in the same subsection all involve materials that are also protected under the First Amendment:  theatrical works, musical compositions, film, radio, or television programs ... original works of fine art ... promotional material or an advertisement for a news reporting or an entertainment medium … [and] an advertisement or commercial announcement for a use described in this subdivision.

*Id.* (citing Ind. Code § 32-36-1-1(c)(1); *see also, Ward v. Rock Against Racism,* 491 U.S. 781, 790 (1989) (music); *Bd. of Trs. v. Fox,* 492 U.S. 469, 477 (1989) (commercial speech); *Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 578 (1977) (news and broadcast entertainment); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 557 (1975) (theatrical works); *Jenkins v. Georgia,* 418 U.S. 153, 156 (1974) (film)).

And while Plaintiffs' point is well-taken that *Sand Creek* was decided prior to the enactment of Indiana's right-of-publicity statute, that fact does not by itself render *Sand Creek* inapplicable.   The case law involving the definition of "newsworthiness" at common law developed and was in place before the passage of this statute.  Under Indiana law, "[t]he legislature is presumed to know the common law and to incorporate it into the statute except where it expressly indicates otherwise."  *Bailey v. Manors Grp.*, 642 N.E.2d 249, 252 (Ind. Ct. App. 1994).  If the legislature intended for the term "newsworthy" to have a different definition under the statute than the one that had already developed through common law, the legislature could have indicated as much.

For these reasons, the Court finds that the Indiana Supreme Court would conclude that the broad definition of "newsworthy," as developed at common law, applies to the statutory exception listed in the right-of-publicity statute.

### b.    Whether the Materials at Issue are "Newsworthy"

Having determined that the common law definition of "newsworthy" applies here, the Court next must determine whether the materials at issue fall within the newsworthiness exception to the statute.  Defendants contend that they fall within the exception because college sports and the activities of collegiate athletes are newsworthy.  (Filing No. 29 at 23-24.)  Plaintiffs respond that Defendants may not avail themselves of the newsworthiness exception, because they are not news organizations.  (Filing No. 44 at 33.)  Plaintiffs also argue that Defendants' creation of fictitious salaries removes the materials at issue from coverage by the exception.  (Filing No. 44 at 32-33.)  In reply, the Defendants argue that nothing in the statute limits its application to news or media outlets.  (Filing No. 52 at 13-14.)  They also contend that Indiana's right-of-publicity statute applies only to certain enumerated personal features, such as names and likenesses.  (Filing No. 52 at 15.)  As such, "extraneous content," such as fantasy salaries, are beyond the coverage of the right-of-publicity statute, and not implicated here.  (Filing No. 52 at 15.)

The Court again turns to the *Sand Creek* formulation, which noted the breadth of the term "newsworthy."  The court described that:

> [t]he scope of the subject matter which may be considered 'of public interest' or 'newsworthy' has been defined in most liberal and far reaching terms.  The privilege of enlightening the public is by no means limited to dissemination of news in the sense of current events but extends far beyond to include all types of factual, educational and historical data, or even entertainment and amusement, concerning interesting phases of human activity in general.

*Sand Creek,* 825 F. Supp. 210 at 211-12 (quoting *Rogers*, 695 F. Supp. at 117).  The Court concludes, as have a number of other courts that have considered the issue in the context of

professional sports, that Plaintiffs' athletic achievements and activities are "newsworthy" as contemplated by the statutory exception. *See, e.g., Dryer v. National Football League*, 55 F. Supp. 3d 1181, 1198 (D. Minn. 2014) (concluding that "there is no dispute that both professional baseball and professional football…are closely followed by a large segment of the public") (quoting *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 411 (2001)). This is no less true for collegiate athletics, as is demonstrated by, among other indicators, the plethora of media outlets dedicated to the coverage of collegiate sporting events. The court in *Moore v. Univ. of Notre Dame,* 669 F. Supp. 1330, 1336 n.11 (N.D. Ind. 1997), for example, concluded that college football is a matter of "public interest." The court reasoned that "[g]iven the growing number of television sports channels and the number of publications relating specifically to sports, this court cannot ignore the fact that this is a matter of public concern." *Id.* Therefore, the use of Plaintiffs' names, likenesses, and the statistical accounts of their athletic achievements fall within the statutory exception.[1]

Plaintiffs contend that the materials at issue nonetheless do not fall within the newsworthiness exception, because Defendants are not "news organizations" and do not engage in "reporting to the public by any common understanding of the term." (Filing No. 44 at 33.) But the statute does not explicitly require that the user of a personality's name or likeness be engaged in "reporting," or be a news or media outlet. Ind. Code § 32-36-1-1(c)(1)(B). Absent a specific reference to such a requirement, the Court will not read one in. Other provisions of the same statute, for example, refer specifically to news and reporting mediums, and the statute specifically defines the term "news reporting or … entertainment medium." *See* Ind. Code § 32-36-1-4. And, as discussed in more detail below, another statutory exemption applies to the "broadcast or

---

[1] The parties agree that, for the purposes of these motions, statistical information regarding Plaintiffs constitutes a "likeness" under the statute.

reporting" of information about a personality, where no such requirement is listed here.  *See* Ind. Code § 32-36-1-1(c)(3) (public interest exception).

Finally, Plaintiffs argue that the "newsworthiness" exception does not apply, taking issue with two other types of materials on Defendants' fantasy sports sites: the assignment of fictitious salaries to Plaintiffs and commentary posted in comment fields or in commentary/blog portions of the sites.  (Filing No. 44 at 32-33; Filing No. 17 at 23.)  The right-of-publicity statute does not prohibit individuals from the use of *all* materials regarding a personality; instead, it defines a person's right of publicity as including that person's name, voice, signature, photograph, image, likeness, distinctive appearance, gestures, and mannerisms.  Ind. Code § 32-36-1-7.  Plaintiffs do not allege specifically whether the assignment of fictitious salaries constitutes a "name" or a "likeness," as contemplated by the statute.  Rather, in their Amended Complaint, Plaintiffs allege that the fictitious salaries are "associated with" Plaintiffs' names.

However, Plaintiffs read the statute more broadly than its plain language allows.  The statute does not prohibit the use of materials "associated with" the name, likeness, or any other of the enumerated aspects of an individual's personality—it prohibits the use of the names and likenesses themselves.  Adopting Plaintiffs' reading of the statute would bring an almost limitless universe of materials within its reach, with obvious First Amendment implications.  For these reasons, the Court concludes that the fictitious salaries and commentary do not constitute a person's name or likeness, and they are not encompassed within the definition of a person's right of publicity.

For these reasons, the Court concludes that the materials challenged by Plaintiffs fall within the "newsworthiness" exception to Indiana's right-of-publicity statute, and therefore the

prohibition of using an individual's right of publicity without his consent does not apply to Defendants' conduct.  The Court, therefore, **grants** Defendants' Motions to Dismiss on this issue.[2]

### 2.    **Public Interest Exception**

The so-called "public interest exception" to Indiana's right-of-publicity statute exempts the use of a person's right of publicity "in connection with the broadcast or reporting of an event or a topic of general or public interest."  Ind. Code § 32-36-1-1(c)(3).  Defendants argue that, for reasons largely overlapping with the "newsworthiness" exception, the public interest exception applies to the materials at issue.  (Filing No. 29 at 25.)  Plaintiffs argue that Defendants' use of Plaintiffs' names and likenesses was not done in connection with the "broadcast or reporting" of an event of public interest, and therefore the exception does not apply.  (Filing No. 44 at 34.) Again, neither the parties nor the Court have identified any Indiana Supreme Court or Court of Appeals case involving this provision, so the Court must determine how an Indiana court would likely decide this issue.

The Court concludes that, for the same reasons that the subject materials are newsworthy, they are also matters of public interest.  As the *Sand Creek* court noted, content falling within those two definitions will often overlap, and they are both to be construed broadly.  *Sand Creek,* 825 F. Supp. 210 at 211-12 (quoting *Rogers*, 695 F. Supp. at 117) ("The scope of the subject matter which may be considered 'of public interest' or 'newsworthy' has been defined in most liberal and far reaching terms."); *see also Moore,* 669 F. Supp. at 1336 n.11 (concluding that college football is a matter of public interest).

---

[2] To the extent that Plaintiffs also challenge Defendants' advertising, the Court concludes that because this exception applies, Ind. Code § 32-36-1-1(c)(1)(E) also exempts related advertising from an individual's right of publicity.  *See* Ind. Code § 32-36-1-1(c)(1)(E) (stating that statute does not apply to "[t]he use of a personality's name, voice, signature, photograph, image, likeness, distinctive appearance, gestures, or mannerisms in an advertisement or commercial announcement for a use described in this subdivision.").

However, a key difference between the two provisions is that the public interest exception includes the condition that the use of a person's right of publicity be done "in connection with the *broadcast or reporting* of an event or a topic," and the newsworthiness exception does not.  Ind. Code § 32-36-1-1(c)(3) (emphasis added).  The legislature carved out distinct exceptions, and Indiana has long followed the rule of interpretation that a statute should be construed so as to give effect to all of its parts.  *Huff v. Fetch*, 194 Ind. 570, 143 N.E. 705, 707 (1924) ("It is not necessary to cite authority to the proposition that an act should be so construed as to give effect to all its parts, if such a construction is reasonable.").

Therefore, the key issue is whether Defendants' conduct constitutes "broadcasting or reporting" under the statute.  Defendants contend that their websites "report" information about college sports, because they profile players on their websites; "corral [the] week's news, notes and injury updates;" and disseminate performance information.  (Filing No. 51 at 10.)  The Court notes that this is not *all* Defendants do with Plaintiffs' likenesses.  In addition, they provide an interactive medium through which players—identified by their names and statistical achievements—may be assembled onto fictitious teams to engage in competition with other fictitious teams.  The question is whether that particular use therefore removes Defendants' conduct from being properly understood as "reporting."

As the Court noted above, the Indiana Supreme Court follows the "familiar canon of statutory interpretation that statutes should be interpreted so as to avoid constitutional issues." *Emmons,* 841 N.E.2d at 162.  Interpreting "reporting" broadly would effectuate the General Assembly's obvious attempt to avoid potential constitutional infirmities with the statute.

The Ninth Circuit in *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1271 (9th Cir. 2013), considered a similar challenge raised by former student athletes

to a video game, which allowed individuals to "control avatars representing college football players as those avatars participate in simulated games." That game replicated each school's entire team, with each player having "a corresponding avatar in the game with the player's actual jersey number and virtually identical height, weight, build, skin tone, hair color, and home state. EA attempts to match any unique, highly identifiable playing behaviors by sending detailed questionnaires to team equipment managers." *In re NCAA*, 724 F.3d at 1271. The athletes' names, however, did not appear on their jerseys or roster in the game. *Id*. A former player brought suit against EA Sports, the video game developer, contending that the game violated his right to publicity under California law. *Id.* at 1282.

EA Sports raised defenses under both common law and the California right-to-publicity statute. *Id.* In both instances, those defenses "protect[ed] only the act of publishing or reporting" matters of public interest. *Id.* The court concluded that the material at issue did not constitute "publishing or reporting," reasoning that:

> EA is not publishing or reporting factual data. EA's video game is a means by which users can play their own virtual football games, not a means for obtaining information about real-world football games. … Put simply, EA's interactive game is not a publication of facts about college football; it is a game, not a reference source. These state law defenses, therefore, do not apply.

*Id.* at 1283. In a footnote to this passage, however, the Ninth Circuit rejected the dissent's argument that the Ninth Circuit should conclude, as did the Eighth Circuit in *C.B.C.*, that because the video game was based on publicly available data, no violation of publicity rights had occurred. The court stated:

> [The dissent] compares *NCAA Football* to the fantasy baseball products that the Eighth Circuit deemed protected by the First Amendment in the face of a right-of-publicity claim in *C.B.C. Distribution and Marketing*, 505 F.3d at 823-24. But there is a big difference between a video game like *NCAA Football* and fantasy baseball products like those at issue in *C.B.C.* Those products merely 'incorporate[d] the names along with performance and biographical data of actual

major league baseball players.'  *NCAA Football,* on the other hand, uses virtual likenesses of actual college football players.

*Id.* at 1283 (citing *C.B.C. Distribution and Marketing, Inc. v. Major League Baseball Advanced Media, L.P.,* 505 F.3d 818 (8th Cir. 2007)).

Here, unlike the video game at issue in *In re NCAA,* Defendants do provide factual data, and their websites could be used as "reference sources," either for purposes of playing the associated game, or for information about the collegiate sports and athletes represented on the websites.  While that factual data is integrated into a game, the actual names and likenesses identified by Plaintiffs are comprised of information about "real-world" games and players.  *See also C.B.C.,* 505 F.3d at 823 (concluding that "the information used in CBC's fantasy baseball games is all readily available in the public domain").

The Court acknowledges that this is a close call.  But given Indiana's interpretive preference to read statutes in a manner that avoids constitutional issues, as well as other Circuits' reasoning on similar issues, the Court concludes that Defendants' materials constitute "reporting," as that term is used in Ind. Code § 32-36-1-1(c)(3).

For these reasons, the Court concludes that the materials challenged by Plaintiffs fall within the "public interest" exception to Indiana's right-of-publicity statute, and therefore the prohibition of using an individual's right of publicity without his consent does not apply to Defendants' conduct.  The Court, therefore, **grants** Defendants' Motions to Dismiss on this basis as well.

### 3.      Literary Works Exception

Defendant DraftKings argues that the fantasy sports contests at issue fall within the "literary works" exception created by the statute.  (Filing No. 29 at 26, citing Ind. Code § 32-36-1-1(c)(1)(A).)  DraftKings contends that the exception should be interpreted broadly, and that the subject websites are analogous to video games that have been held to be encompassed by the

exception.  (Filing No. 29 at 27.)  DraftKings also points to the copyright law context in which computer programs and video games can be copyrighted as "literary works."  (Filing No. 29 at 27-28.)  Again, Plaintiffs argue that the exception should not be read so broadly, and that the fantasy sports websites are not analogous to computer programs or video games.  (Filing No. 44 at 36-38.) Plaintiffs contend that DraftKings' reading of the exception would render all content conveyed via websites "literary works," which is a result not intended by the legislature in enacting the statutory exceptions.  (Filing No. 44 at 37-38.)

At the motion to dismiss stage, the Court simply cannot conclude that the websites at issue fall within the literary works exception.  First, DraftKings points to other courts' conclusions that video games are literary works, and they argue that their websites "had attributes analogous to electronic games…that have been held to constitute literary works."  (Filing No. 29 at 27.)  The Court notes, however, that DraftKings attempts to thread a very fine needle with this argument, given the position they have taken regarding the public interest exception.  In attempting to distinguish their case from *Keller* and *Davis*, in which courts concluded that sports-related video games did not constitute "publication" or "reporting," Defendants argued that their fantasy sports websites were unlike those games, in that they did not allow users to create avatars through which to play "their own virtual football games."  (Filing No. 51 at 10-11.)  Second, DraftKings does not articulate why the particular features of fantasy sports competitions are similar to the video games that courts have determined constitute literary works.  And, the particular features of the fantasy sports competitions—such as their technical similarities to or differences with computer programs or video games—are factual issues not before this Court at the motion to dismiss stage.

Therefore, the Court cannot conclude at this stage that Defendants' websites constitute "literary works" within the meaning of Ind. Code § 32-36-1-1(c)(1)(A).

4.      __Performers of Recorded Performances Exception__[3]

Indiana Code Section 32-36-1-1(c)(2)(B) specifically exempts from the statute's coverage "[t]he use of a personality's name to truthfully identify the personality as the performer of a recorded performance under circumstances in which the written work or recorded performance is otherwise rightfully reproduced, exhibited, or broadcast."  The parties have not cited, and the Court has not located, any cases applying this exception.  Therefore, again, this Court must predict how the Indiana Supreme Court would decide the case.

Defendants argue that the inclusion of Plaintiffs' names on the fantasy sports websites truthfully identified Plaintiffs as performers of recorded performances, and therefore that such use is exempted by Ind. Code § 32-36-1-1(c)(2)(B).  (Filing No. 27 at 14-15.)  Plaintiffs respond that Defendants did not exhibit, reproduce, or broadcast any recorded performances, so this exception does not apply.  (Filing No. 44 at 38-39.)  In reply, Defendants argue that the statute does not require them to be the entity that "otherwise rightfully reproduce[s], exhibit[s], or broadcast[s] the recorded performance."  (Filing No. 52 at 18.)

The Court concludes that even if Defendants are correct that they need not be the entities that broadcast the recorded performance, that issue is not determinative here.  The decisive issue is that Defendants use Plaintiffs' names and likenesses for purposes other than to identify them as performers of a recorded performance.  At a minimum, Defendants also listed selections of Plaintiffs' athletic and statistical achievements.[4]  The statute itself only lists a personality's "name" as subject to coverage by this exception, and Defendants have offered no justification as to why it

---

[3] Defendant DraftKings does not separately brief this issue, but joins in Defendant FanDuel's briefing.  (Filing No. 29 at 21.)

[4] And, though none of the parties address the significance of this fact, Defendants also identified Plaintiffs as members or potential members of customers' fantasy "teams" of players.

should expanded to cover the other uses—including Plaintiffs' likenesses—that are at issue in this case.

The Court therefore concludes that the "performer of a recorded performance" exception does not apply to the materials at issue.

### 5.   Effect of Alleged Illegal Conduct

Plaintiffs contend that if the Court concludes that any of the statutory exceptions would otherwise apply, they cannot in this instance, because Defendants were engaged in illegal conduct by operating their fantasy sport websites in Indiana.  (Filing No. 44 at 20.)  Defendants respond that Plaintiffs cite no authority to support the contention that allegedly illegal behavior negates the applicability of the statutory exemptions, and that in any event, their conduct was not illegal.  (Filing No. 52 at 8-11.)

Setting aside the issue of whether it would be appropriate for this Court to make a finding as to whether Defendants engaged in conduct that violated Indiana law, Plaintiffs provide no authority or citation to support the contention that illegal behavior would render Defendants' materials somehow outside the scope of the statutory exceptions.  The statute itself does not include any such provision, and Plaintiffs have cited no other authority or rule of law in support of their contention.  The Court cannot conclude that, even if Defendants were engaged in illegal conduct, such conduct would render Indiana Code §32-26-1-1 inapplicable.[5]

---

[5] Plaintiffs have filed a Motion for Leave to File Surreply (Filing No. 60), contending that the Defendants raised argument regarding the legality of their conduct for the first time in their reply, thus entitling the Plaintiffs to address those arguments through a supplemental filing.  Because the Court concludes that the legality of the Defendants' conduct has no bearing on the resolution of this issue, the Plaintiffs' Motion is **denied as moot.**

B.   __First Amendment Defense__

Defendants argue that, in addition to the statutory exemptions, the use of Plaintiffs' names and likenesses is speech protected by the First Amendment.  (Filing No. 29 at 28.)  Defendants argue that under three different tests employed by courts in evaluating First Amendment claims, the materials at issue constitute protected speech.  (Filing No. 29 at 28.)  Plaintiffs respond that the materials at issue are commercial speech and are therefore subject to lesser First Amendment protections.  (Filing No. 44 at 40.)  Plaintiffs also argue that Seventh Circuit precedent establishes that Defendants' speech is not protected by the First Amendment, and that under the application of any test, Defendants are not entitled to a First Amendment defense.  (Filing No. 44 at 47-56.)

Defendants' argument that the First Amendment shields their conduct from liability represents an affirmative defense.  The Seventh Circuit has concluded that "…when the existence of a valid affirmative defense is so plain from the face of the complaint that the suit can be regarded as frivolous, the district judge need not wait for an answer before dismissing the suit."  *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002); *see also Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("[o]rders under Rule 12(b)(6) are not appropriate responses to the invocation of defenses, for [parties] need not anticipate and attempt to plead around all potential defenses," and "only when [a party] pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a [pleading] that otherwise states a claim be dismissed under Rule 12(b)(6)"); *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003) ("[a]ffirmative defenses do not justify dismissal under Rule 12(b)(6)").

The Court concludes that the existence of Defendants' First Amendment defense is not "so plain" from the face of the Amended Complaint that the suit can be regarded as frivolous.  And the Court concludes that consideration of this defense requires an analysis of evidence that is not

20

possible or appropriate at the motion to dismiss stage.  For example, the first issue facing the Court in evaluating a First Amendment defense is to classify the speech at issue as either commercial or non-commercial, and the Court concludes that it cannot do so at this stage.  The First Amendment prohibits the government from "abridging the freedom of speech."  U.S. Const. amend. I.  The Supreme Court has concluded that "not all speech is of equal First Amendment importance," and that some categories of speech receive a lesser degree of constitutional protection.  *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509 (7th Cir. 2014) (citing *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). Commercial speech "is constitutionally protected but governmental burdens on this category of speech are scrutinized more leniently."  *Id.* (citing *Bd. Of Trs. Of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989)).

While speech that does no more than propose a commercial transaction clearly falls within the definition of commercial speech, so can speech that links a product to a current public debate, or speech that links commercial and non-commercial elements.  *Jordan,* 743 F.3d at 516-17.  In order to determine whether such "mixed" speech should be classified as commercial or non-commercial, the Seventh Circuit has highlighted the following relevant considerations: "whether (1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic motivation for the speech."  *Id.* at 517 (quoting *United States v. Benson*, 561 F.3d 718, 725 (7th Cir. 2009)).  "This is just a general framework, however; no one factor is sufficient, and *Bolger* strongly implied that not all are necessary."  *Jordan*, 743 F.3d at 517 (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 n. 14 (1983)).[6]

---

[6] Defendants request the Court to forego the commercial versus non-commercial speech analysis, instead stating that the Eighth Circuit's decision (also on appeal of summary judgment) in *C.B.C.*, 505 F.3d is "dispositive of the present suit."  (Filing No. 29 at 29.)  This Court is bound by the Seventh Circuit's determinations, and Defendants have offered no explanation as to why this Court would not be required to follow this Circuit's practice of first characterizing the speech at issue.  As such, the Court declines Defendants' invitation to simply apply the rationale articulated in *C.B.C.*

In *Jordan*, a case in front of the Seventh Circuit on appeal of the grant of summary judgment, the court carefully evaluated the specific advertisement at issue, examining its language, the size and placement of text and images, and the background of the development of the advertisement. *Jordan*, 743 F.3d at 512-13. At the motion to dismiss stage, the Court does not have the proper factual and evidentiary basis to conduct such an analysis, and therefore cannot make the threshold determination as to whether the speech at issue should be properly characterized as commercial or non-commercial.

The Court therefore **denies** Defendants' Motion to Dismiss on the grounds of a First Amendment affirmative defense.

**C.**    **Preemption by Federal Copyright Law**

The Copyright Act includes an express preemption provision which provides that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright ... are governed exclusively by [the Copyright Act]." 17 U.S.C. § 301(a). As such, state law rights granted by statute "are only valid if they do not interfere with federal copyright protections." *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 908 (7th Cir. 2005). DraftKings argues that Indiana's right-to-publicity statute is preempted by the Copyright Act. (Filing No. 29 at 41.)

Both DraftKings and Plaintiffs cite to the Seventh Circuit's opinion in *Toney* as being determinative here, but both parties overlook the particular aspect of *Toney* that decides the case. In that case, plaintiff Toney's photograph was used without her permission to advertise a hair care product. *Toney*, 406 F.3d at 907. She sued defendant L'Oreal pursuant to Illinois' Right to Publicity Act. *Id.* In deciding whether Toney's state law claim was preempted by the Copyright Act, the Seventh Circuit highlighted that Illinois' statute states "that a person's 'identity' is protected by the statute," and that the statute defined "identity" to mean "any attribute of an

22

individual that serves to identify that individual to an ordinary, reasonable viewer or listener, including but not limited to (i) name, (ii) signature, (iii) photograph, (iv) image, (v) likeness, or (vi) voice." *Id.* at 908 (citing 765 Ill. Comp. Stat. 1075/5). Further, the Court concluded that:

> [t]he subject matter of such a claim 'is *not* a particular picture or photograph of plaintiff. Rather, what is protected by the right of publicity is the very identity or persona of the plaintiff as a human being.' A photograph 'is merely one copyrightable 'expression' of the underlying 'work,' which is the plaintiff as a human being. There is only one underlying 'persona' of a person protected by the right of publicity.' *Id.* In contrast, '[t]here may be dozens or hundreds of photographs which fix certain moments in that person's life. Copyright in each of these photographs might be separately owned by dozens or hundreds of photographers.' A persona, defined in this way, 'can hardly be said to constitute a 'writing' of an 'author' within the meaning of the copyright clause of the Constitution.'

*Id.* at 908-09 (citing Thomas McCarthy, 2 Rts. Of Publicity & Privacy § 11:52 (2d ed. 2004)) (emphasis in original).

*Toney*, therefore, does not support DraftKings' contention that the subject matter at issue is "a database of athlete names and statistics." (Filing No. 29 at 41.) The Court concludes that the Indiana Act mirrors the Illinois Act in the respects highlighted by the Seventh Circuit—it seeks to protect the persona of the plaintiff, like the Illinois statute, by enumerating attributes unique to each individual. The subject matters at issue here, as in *Toney*, are the personas of Plaintiffs, as represented here by their names and likenesses.

The court in *Toney* then went on to evaluate the two conditions imposed by the Copyright Act, which if met, require the preemption of the state law claim. First, "whether the work at issue is fixed in a tangible form and whether it comes within the subject matter of copyright as specified in § 102. Second … whether the right is equivalent to the general copyright protections which are set out in § 106." *Toney*, 406 F.3d at 909. The court concluded that:

> Toney's identity is not fixed in a tangible medium of expression. There is no 'work of authorship' at issue in Toney's right of publicity claim. A person's likeness— her persona—is not authored and it is not fixed. The fact that an image of the person

might be fixed in a copyrightable photograph does not change this.  From this we must also find that the rights protected by the IRPA are not 'equivalent' to any of the exclusive rights within the general scope of copyright that are set forth in § 106. Copyright laws do not reach identity claims such as Toney's.  Identity, as we have described it, is an amorphous concept that is not protected by copyright law; thus, the state law protecting it is not preempted.

*Id.* at 910.  Having already concluded that this case is factually analogous to *Toney*, the Court concludes that the same result is required here.  Indiana's right-of-publicity statute is not preempted by the Copyright Act.  As such, the Court **denies** DraftKings' Motion to Dismiss on the basis of preemption.

## IV.  CONCLUSION

The Court has determined that at least two of the statutory exceptions to Ind. Code § 32-36-1-8(a) apply, which removes Defendants conduct from coverage under Indiana's right of publicity statute. For the reasons explained in this Entry, the Defendants' Motions to Dismiss, (Filing No. 26; Filing No. 28), are **GRANTED** and Plaintiffs' Motion for Leave to File Surreply (Filing No. 60) is **DENIED as moot**.  Final judgment shall issue.

**SO ORDERED.**

Date:  9/29/2017

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

24

DISTRIBUTION:

John R. Maley
BARNES & THORNBURG LLP
jmaley@btlaw.com

Benjamin Margulis
BOIES SCHILLER & FLEXNER LLP
bmargulis@bsfllp.com

Damien J. Marshall
BOIES SCHILLER & FLEXNER LLP
575 Lexington Ave.
New York, New York 10022

Leigh M. Nathanson
BOIES SHCILLER & FLEXNER LLP
lnathanson@bsfllp.com

Craig Eldon Pinkus
BOSE MCKINNEY & EVANS, LLP
cpinkus@boselaw.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP
pzimmerly@boselaw.com

Kenneth L. Doroshow
JENNER & BLOCK LLP
kdoroshow@jenner.com

Stephen B. Caplin
PROFESSIONAL CORPORATION
sbcaplin@gmail.com

Joseph J. Siprut
SIPRUT PC
jsiprut@siprut.com

William Clifton Holmes
THE HOLMES LAW GROUP, LTD
holmes@theholmeslawgroup.com